N. F. BEN-AVI AND JESSICA BEN-AVI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ben-Avi v. Commissioner
Docket No. 2344-86.
United States Tax Court
T.C. Memo 1988-74; 1988 Tax Ct. Memo LEXIS 100; 55 T.C.M. (CCH) 199; T.C.M. (RIA) 88074; February 24, 1988. Douglas C. Pope, for the petitioners. Marion S. Friedman and Carol Bingham McClure, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined a deficiency in petitioners' 1981 Federal income tax in the amount of $ 14,054.75. The issues this Court must decide are (1) whether the statute of limitations bars assessment of any tax due in respect of petitioners' 1981 Federal income tax return, (2) whether petitioners are entitled to a deduction for research and experimental expenditures pursuant to section 174, [1] and (3) whether petitioners are entitled to a credit for increasing *102 research activities pursuant to section 20. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners were husband and wife during 1981 and resided in Houston, Texas on the date the petition was filed. As of November 30, 1980, petitioners were stockholders in Satellite Services, Inc. ("SSI"). SSI was actively engaged in the sale, repair and development of satellite communications equipment. SSI provided short-term communications for offshore oil drillers through the sale, rental and service of satellite terminals. Because of the inherent limitations in SSI's domestic satellite transmitting and receiving equipment, in 1979 SSI began to modify its equipment. By 1981 Edward Moser, president of SSI, recognized the need for SSI to develop a new generation of equipment and requested a group of stockholders who controlled SSI, including petitioner N. F. Ben-Avi, to arrange funding for the development project. In response to this request for funds, this group of shareholders formed the Offshore Communications *103 Research and Development Partnership ("Offshore") on November 25, 1981. Petitioner N. F. Ben-Avi entered into the Offshore partnership agreement with other shareholders of SSI. [2] Partnership contributions to Offshore totaled $ 355,000.00, and N. F. Ben-Avi contributed capital in the amount of $ 25,000.00. On the day of its formation Offshore entered into a Technology Development and Transfer Agreement ("Transfer Agreement") with SSI. Under the agreement SSI transferred to Offshore "Existing Technology" in exchange for the partnership's funding of a "Sponsored Research Program." [3] The "Existing Technology" subject to the Transfer Agreement was not patented and *104 no patents were prosecuted by either Offshore or SSI under the Agreement. SSI further agreed to pay royalties to Offshore in exchange for an exclusive license to use Offshore's newly acquired "Program Assets." [4] The Transfer Agreement was to terminate on the earlier of December 31, 1991 or upon the exercise of SSI's option to purchase all of Offshore's right, title and interest in the Program Assets. [5]
*105 The Transfer Agreement required that during the Development Phase both SSI and Offshore would safeguard the confidentiality of all confidential information included with the Program Assets. [6]SSI, rather than Offshore, had the right under the Agreement to design, produce, manufacture, use or sell products which utilized or embodied Program Assets as long as the Program Assets remained patentable. After the Development Phase Offshore was required to return to SSI all documents or copies of documents with respect to the Program Assets while remaining subject to the limitations on use and disclosure set forth in section 5.2 and 5.3 of the Transfer Agreement. SSI, on the other hand, would have full rights to use or disclose in any manner all Program Assets at the termination of the Development Phase. [7]
*106 Pursuant to the Transfer Agreement Offshore paid $ 353,000.00 to SSI in 1981. Of that amount $ 325,877.40 was expended by SSI during 1981 but only $ 282,301.16 was expended on research and experimentation. SSI expended $ 27,122.60 in 1982 in connection with research. The transaction with SSI under the Transfer Agreement was the only activity engaged in by Offshore. Offshore did not engage in correspondence with any party or receive correspondence from any party in connection with its transaction with SSI or the proposed research. During 1981 and 1982, Offshore maintained a bank account at San Felipe Bank, Houston, Texas. Petitioner N. F. Ben-Avi was the authorized signatory on this account. Offshore's bank records reflect the following activity for 1981 and 1982: Total Deposits
Total Checks
Ending
Statement Period
and Credits
and Debits
Balance
00/00/00 through 11/30/81
$ 400,000.00
$  50,000.00
$ 350,000.00
11/30/81 through 12/31/81
15,000.00
358,780.06
6,219.94
12/31/81 through 01/29/82
-0-
5,000.00
1,219.94
1/29/82 through 02/82/82
-0-
350.00
869.94
Offshore had no banking activity in 1981, 1982 or later periods *107 other than as reflected above. Offshore's Form 1065, U.S. Partnership Return of Income for 1981 was prepared based on the cash receipts and disbursement method of accounting. On its return Offshore claimed a deduction for $ 353,000.00 for "Contract Research Expenses" and a deduction for $ 780.06 for office supplies and legal expenses. On their 1981 Federal income tax return petitioners claimed a distributable loss from Offshore in the amount of $ 24,906.00 and a tax credit for increasing research activities in carrying on a trade or business in the amount of $ 2,019.81. Respondent disallowed $ 24,851.00 of the loss and the entire tax credit. On September 9, 1985, after the statute of limitations had expired on May 5, 1985, respondent mailed to petitioner a notice of deficiency. Respondent contends that the notice of deficiency is valid because petitioners signed, or had executed on their behalf, a Form 872-A, Special Consent to Extend the Time to Assess Tax. The Houston District for the Internal Revenue Service mailed a Form 872-A to petitioners' Houston address prior to November 6, 1984. The Houston district received the form back on November 6, 1984 with petitioners' *108 names signed on it. Because Mrs. Ben-Avi's name was not signed on the proper line, the Form 872-A was mailed back to petitioners' Houston address by respondent on November 7, 1984. The form was again received by respondent on November 30, 1984, signed on the proper lines with the names of both petitioners. Revenue Agent Roy Fite executed the form on December 5, 1984, and sent a copy to petitioners' Houston address accompanied by a transmittal letter. The Form 872-A was mailed to petitioners' Houston address as a part of normal Internal Revenue Service business procedures. Petitioners' file was handled by respondent's Examination Support Staff (ESS) in the normal course of business. ESS procedures were regular in this case, and respondent reasonably relied on the validity of the signatures on the Form 872-A. Petitioners, however, did not sign the Form 872-A. In September of 1984 petitioners went to live with their daughter in Israel so that N. F. Ben-Avi could recuperate from heart surgery performed in the summer of that year. They resided in Israel between September 1984 and January 1985 and between May 4, 1985 and October 11, 1985. Petitioners did not provide respondent *109 with their mailing address in Israel. In their absence petitioners arranged with their son Chaim Abramowitz and their nephew Michael Abramowitz to take care of the mail that came to petitioners' house. The mail was deposited directly into petitioners' house through a mail slot; the mail would usually drop to the floor where it could not be disturbed by someone outside the house. Michael Abramowitz would enter petitioners' home several times a week, throw away advertisements and other non-essential mail, and leave the rest on the table. Michael Abramowitz had no personal knowledge of whether any mail arrived at petitioners' home from the Internal Revenue Service, but he did not sign petitioners' names to the Form 872-A. Petitioners' Son Chaim Abramowitz, went to his parents' home once a month to go through the stack of mail left on the table. He testified that he would pay his parents' bills and send important mail to them in Israel. Although Chaim Abramowitz had authority to sign on his parents' bank account, he had no authority to sign for his parents in connection with any Internal Revenue matter; he did not sign the Form 872-A on his parents' behalf. Petitioners' *110 other five children had keys to their parent's home. None of them were called to testify. Patricia Banfill also had a key to petitioners' house. She had entered petitioners' house several times during petitioners' stay in Israel in order to give the exterminator access to the house and was entrusted with checks in payment of the exterminator's services to petitioners. Mrs. Banfill was the wife of James Banfill, who was a stockholder in SSI and who was N. F. Ben-Avi's partner in a firm of Certified Public Accountants for 16 years. The Banfills were petitioners' personal friends. Mrs. Banfill did not testify concerning Internal Revenue Service correspondence to petitioners. Mr. James Banfill was not called as a witness. OPINION We first consider whether the statute of limitations bars the assessment of any tax due in respect of petitioners' 1981 Federal income tax return. Section 6501(a) provides generally that any Federal income tax must be assessed within three years after the tax return is filed. A taxpayer and the Secretary may, however, agree in writing to extend the period *111 for assessment. Section 6501(c)(4). Respondent's Form 872-A is used for such agreements. Petitioner N. F. Ben-Avi testified at trial that he did not authorize anyone to sign the Form 872-A on his behalf. He testified that he thought perhaps someone had assumed the responsibility of forging his and his wife's signatures in the misguided belief that they were helping him while he was abroad. Based on our observation of the witness on the stand, we cannot accept this testimony. Petitioner is a C.P.A. and a lawyer and practiced before the Internal Revenue Service his entire career. Petitioner impressed the Court as a man who manages his affairs with an eye for every detail. It is not believable that he had not asked a trusted friend or family member to watch for any IRS correspondence. Petitioner was aware of the audit prior to his departure from this country. The promptness with which the Form 872-A was mailed back to respondent confirms our belief that petitioner authorized someone to sign the Form 872-A on his behalf. Moreover, petitioner's vituperative, combative and uncooperative demeanor on the stand persuades the Court that he would not have left the fortunes of his *112 audit by respondent to chance. While the record does not disclose the identity of the authorized individual, petitioner did not show that those who had access to his mail did not execute the Form 872-A on his behalf and with his consent. They did not call as witnesses their other five children or James Banfill, all of whom had access to petitioners' home during petitioners' absence. We note especially petitioners' failure to call James Banfill, N. F. Ben-Avi's personal friend, who is a C.P.A. and had been petitioner's partner in his accounting practice for 16 years. Banfill is also a shareholder in SSI. "The rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable." Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Consequently, we hold that the statute of limitations does not bar a determination or assessment of petitioners' 1981 Federal *113 income taxes. We, therefore, do not need to address respondent's agency or equitable estoppel arguments. The next issue we must decide is whether petitioners are entitled to a deduction for research and experimental expenditures under section 174. Section 174(a)(1) provides that research and experimental expenditures incurred during the taxable year in connection with a taxpayer's trade or business may, at the taxpayer's election, be deducted currently rather than capitalized. In Snow v. Commissioner,416 U.S. 500 (1974), the Supreme Court held that to obtain a deduction under section 174, a taxpayer need not currently be engaged in a trade or business. The Court, however, did not eliminate the trade or business requirement from section 174. As we stated in Green v. Commissioner,83 T.C. 667, 686-687 (1984): For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and we must still determine, through an examination *114 of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section. * * * [Emphasis in original.] In Green the taxpayer was a partner in a research development partnership that had entered into several agreements with a research and development contractor. These agreements were (1) a technology acquisition agreement, (2) a research and development contract and (3) an exclusive license agreement. After analyzing the facts and circumstances we concluded that the taxpayer's partnership failed to satisfy the requirement that it be engaged in a trade or business "at some time." In support of this conclusion we relied on the following facts: (1) neither the partnership nor its general partner had a history as a trade or business, (2) the partnership itself did not conduct any research but rather its activities were merely ministerial; and (3) the partnership would never have been able to produce or market the subject inventions because of the exclusive license *115 it had granted to the research and development contractor. Green v. Commissioner, supra at 688. We therefore held that the partnership "functioned only as a vehicle for injecting risk capital into the development and commercialization of the four inventions. Its activities never surpassed those of an investor." Green v. Commissioner, supra at 687. The facts in this case are substantially similar to the facts in Green. First, while not determinative, the Offshore partnership had no existing trade or business when it entered its agreements with SSI. Indeed, Offshore executed the Technology Development and Transfer Agreement with SSI the day the partnership was formed. The transaction with SSI was Offshore's only activity. Moreover, the partnership did not prosecute any patents under this agreement or at any other time. While know-how and other non-patentable technology may be important elements to continuing research, petitioner has not demonstrated that to be the case here. Second, Offshore did not conduct any research or experimentation. Offshore acquired the Program Assets through the Transfer Agreement with SSI and within the same *116 agreement licensed the Assets back to SSI so that the corporation could conduct its own research and experimentation with the Program Assets. Offshore had no right to control the research or right to review the work performed by SSI. Offshore's only substantive right under the Transfer Agreement was to collect royalties from gross sales and lease income. As a consequence, Offshore's activities were purely ministerial. The inactivity of the partnership bank account and the lack of any correspondence by or to the partnership confirm that Offshore's only function was to collect the capital payments from the partners and pay the money to SSI in order to fund the corporate research. Third, Offshore could not produce or market any fruits of the research because of the exclusive license it had granted to SSI. Offshore gave SSI the exclusive license to use the Program Assets for the term of the Development Phase. The corporation had the right during the Development Phase to design, produce, manufacture, use or sell products which embodied or utilized any Program Assets. The partnership's only right in the Program Assets was to use and grant to others the right to use confidential *117 information disclosed to it by SSI solely for the purpose of research and development, which it never conducted. At the end of the Development Phase, i.e., December 31, 1991, the agreement requires Offshore to promptly return to SSI all documents within its control or possession relating to the Program Assets. The nub of the contractual arrangement after development between Offshore and SSI is that Offshore has no right to use the Program Assets while SSI has full rights to use or disclose in any manner all Program Assets. In essence the Transfer Agreement between Offshore and SSI was merely an investment contract whereby SSI received funding for its research and development projects while Offshore received royalty payments from the sale or lease of the developed assets. The transaction was a paper-shuffle, designed to secure for a controlling group of SSI's shareholders tax benefits not otherwise allowable for a contribution of capital to SSI. Offshore had not substance other than as a conduit for capital to SSI and supposed tax benefits to the partners. We therefore hold that Offshore's "expenditures" were contributions of capital to SSI and were not expenditures "in connection *118 with" a trade or business as required by section 174. Petitioners are not entitled to a deduction for research and experimentation expenditures pursuant to section 174(a)(1). Our characterization of Offshore's relationship to SSI is supported by the testimony of Edward Moser, president of SSI. He testified that during 1981 SSI was in need of funding for the development of a new generation of equipment. He made this need known to a group of controlling stockholders of SSI. In response, these shareholders, including petitioner N. F. Ben-Avi, formed the Offshore partnership and entered into the Technology Development and Transfer Agreement with SSI. The partnership raised $ 353,000.00 in funds and contributed the funds to SSI for research and development expenses. Thus, Offshore "functioned only as a vehicle for injecting risk capital" into SSI. "It's activities never surpassed those of an investor." Green v. Commissioner, supra at 687. The next issue we must decide is whether petitioners are entitled to a credit for increasing research activities pursuant to section 30. *119 Section 30 provided generally a credit for "qualified research expenses." "Qualified research expenses" are the sum of in-house research expenditures and contract research expenditures which are paid or incurred by the taxpayer during the taxable year in carrying on any trade or business of the taxpayer. Section 41(b)(1). [8] The "carrying on of a trade or business" requirement in section 30 was the same requirement found in section 162. H. Rept. 97-215 (Conf.), 97th Cong., 1st Sess. 223 (1981). Because we have held that the Offshore partnership does not satisfy the less restrictive trade or business requirement of section 174, a fortiori, the partnership does not satisfy the more restrictive trade or business test of sections 30 and 162. Offshore was not carrying on a trade or business and, therefore, a credit for increasing research expenditures pursuant to section 30 is not available to Offshore's partners. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. ↩
2. From 1981 through 1983, petitioner Ben-Avi owned 11.54 percent of the outstanding shares of SSI. Each of the other Offshore partners owned interests in SSI as follows: Percentage of
Partner
Shares Owned
Grant Woodard
15.38
Gerald Zlotnick
11.54
Arnold Berlin
.38
William F. Estes
.77
Michael Abramowitz
1.15
Stephen White
1.15
L. R. and Kathryn Millison
.38
Petitioner Jessica Ben-Avi was not a partner in Offshore but owned .58 percent of the shares of SSI. ↩
3. The Technology Development and Transfer Agreement states in part: THIS TECHNOLOGY DEVELOPMENT and TRANSFER AGREEMENT DATED AS OF November 25,, 1981, is between Satellite Services, Inc. (SSI), a corporation organized and existing under the laws of the State of Texas, having its principal place of business at 7800 Bissonnet, Suite 450, Houston, Texas, and Offshore Communications Research and Development Partnership (the "Partnership"), a partnership organized and existing under the laws of the state of Texas, with its principal place of business at 3200 Kirby Drive, Suite 200, Houston, Texas. * * * 2. DEVELOPMENT PHASE (a) Assignment of Existing Technology. As consideration, SSI hereby assigns to the Partnership all of its rights, title and interest in and to the Existing Technology for use solely in the conduct of its research and development business during the Development Phase. To protect the value of Program Assets, during the Development Phase, SSI and the Partnership will make available to third parties the Program Assets only on terms including appropriate restrictions on the use of Program Assets, and the disclosure of Confidential Information therein, consistent with the provisions of this Agreement relating thereto. * * * (b) Funding of Sponsored Research Programs. The Partnership hereby agrees to fund a Sponsored Research Program conducted by SSI for the research and development of Program Assets. Such funding shall not exceed the total amount of capital contributed by all the Partners to the Partnership. 3. OWNERSHIP OF PROGRAM ASSETS 3.1 Subject to Section 6, the Partnership shall own the entire right, title and interest in and to the Program Assets, including the right to enforce any rights therein during the Development Phase. * * * ↩
4. Section 4 of the Technology Development and Transfer Agreement states: 4. LICENSE OF PROGRAM ASSETS TO SSI. During the Development Phase, SSI shall have the right to design, produce or manufacture, use or sell products which embody or utilize any Program Assets, and for this purpose, the Partnership hereby grants to SSI a non-assignable exclusive license, with the right to sublicense, to use such Program Assets for the term of the Development Phase, provided, however, that SSI shall use the Program Assets in compliance herewith and shall not use the Program Assets in any manner that will preclude the patent-ability of any Program Assets. During the Development Phase, SSI shall pay to the Partnership royalties equal to (a) 5% of Gross Sales and (b) 20% of Lease Income in the manner provided in Section 6.4. Except pursuant to a license as provided in this Section 4, SSI shall not utilize Program Assets to design, produce or manufacture, use and sell products on a commercial basis during the Development Phase. ↩
5. Exhibit A Definitions state in part: A-2 Development Phase↩ shall mean that period beginning with the date of this Agreement and ending on the exercise of the option under Section 6.1 of this Agreement, but in no case later than December 31, 1991. 6. Section 5.2 of the agreement provides: During the Development Phase, except as permitted in Section 4, or to the extent necessary or appropriate in connection with a Sponsored Research Program, neither party shall assign, transfer, disclose, license, make available or otherwise dispose or make use of with or to a third party, any Program Assets. ↩
7. The Agreement states in part:
* * * After the Development Phase, (a) the Partnership shall remain subject to the limitations on use and disclosure set forth in this Section 5.2 and Section 5.3; (b) the Partnership shall promptly return to SSI all documents or copies of documents or other tangible manifestations or copies thereof within its control or possession with respect to the Program Assets that it has received from SSI pursuant to this Agreement; and (c) SSI shall have full rights to use or disclose in any manner all Program Assets. Information which is disclosed in a patent or a protection certificate or which through no fault or omission of either party hereto is disclosed in published literature, or which becomes generally known to the industry, or is received from a third party without a binder of secrecy or breach of this Agreement shall not thereafter be deemed to be Program Assets subject to the foregoing. 5.3. Protection of Confidential Information. The Partnership and SSI shall each at all times take all steps which are necessary or reasonable to safeguard the confidentiality of all Confidential Information included within the Program Assets. 6. OPTION TO PURCHASE 6.1 Option. The Partnership hereby grants to SSI the exclusive right and option to purchase any time after December 31, 1981, all of the Partnership's right, title and interest in and to all (but not less than all) of the Program Assets. This option shall be exercised by notice in writing to the Partnership given at any time after December 15, 1981. 6.2 Transfer of Technology.↩ Upon exercise of the option provided for in Section 6.1, and from time to time thereafter, the Partnership will execute and deliver to SSI at its principal place of business, such assignments, instruments and documents of transfer and will take such further action as SSI may transfer, vest and confirm in SSI all right, title and interest in and to the Program Assets. 8. Section 30 was amended and redesignated as section 41↩ by Pub.L. 99-514, section 231(a)(1), 100 Stat. 2085.